Filed 12/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL KERKELES, | H040919 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-08-CV103523) |
| v. | |
| CITY OF SAN JOSE, et al., | |
| Defendants and Respondents. | |

Plaintiff Michael Kerkeles appeals from an order awarding him a small fraction of the attorney fees he requested after settling his civil rights lawsuit against the City of San Jose (the City) and Matthew Christian, a police officer for the City. Plaintiff contends that the reduction of his fee claim was legally unsupportable because the court (1) arbitrarily awarded the fees at less than half the market rate without articulating a basis for its ruling, (2) erroneously determined that fees were unavailable under Code of Civil Procedure section 1021.5, (3) failed to address enhancement of the award under 42 United States Code section 1988 (section 1988), and (4) erroneously ruled that contingent risk could not be considered as an enhancement factor under state law. We find the court's reasoning to be inadequate and must therefore return this matter for reconsideration under the law governing analysis of section 1988 fee claims.

*Background*

The facts underlying this lawsuit are related in a previous opinion, *Kerkeles v. City of San Jose* (2011) 199 Cal.App.4th 1001 (*Kerkeles I*). Briefly summarized, defendants accused plaintiff in a criminal complaint of oral copulation with a developmentally

disabled 22-year-old woman. At the preliminary hearing Christian testified based on a fabricated lab report, which led to plaintiff's being held to answer. After the false evidence was revealed, the district attorney dismissed the charges against plaintiff.

Plaintiff brought suit in 2008, naming both Christian and the City. In his complaint he alleged violation of his civil rights under 42 United States Code section 1983 (section 1983) and Civil Code section 52.1, abuse of process, malicious prosecution, false imprisonment, intentional and negligent infliction of emotional distress, negligence, and (against the City) negligent hiring, retention, training, supervision, and discipline. The superior court granted defendants' motion for summary adjudication of the civil rights claims and those of malicious prosecution and false imprisonment, and it granted judgment on the pleadings on the causes of action for negligent infliction of emotional distress, negligence, and negligent hiring and supervision. Plaintiff dismissed the remaining claims without prejudice, and judgment was entered for defendants.

In *Kerkeles I* this court reversed the judgment, based on defendants' failure to meet their initial burden to show entitlement to adjudication of the civil rights claims as a matter of law. We further found error in the court's refusal to permit plaintiff to amend his complaint to add a conspiracy claim. We therefore remanded the case "for reconsideration of plaintiff's amendment request and for trial or other disposition of the first two causes of action."

The parties thereafter prepared for trial, which, according to defendants, was set for March 25, 2013.[1] The day before trial, the parties settled the dispute. In exchange for plaintiff's release of the City and its employees (including Christian), the City agreed to

---

[1] This court filed its opinion in *Kerkeles I* on October 4, 2011. Defendants' petition for review in the Supreme Court was denied December 21, 2011, and the remittitur issued on December 27, 2011.

pay plaintiff $150,000 and promised not to oppose any motion plaintiff might bring for a declaration of factual innocence of the criminal charges brought against him.  Pertinent to the issues now on appeal was the following additional provision:  "2.  The parties agree that Plaintiff's counsel may seek an award of the costs incurred and reasonable attorney's fees pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. section 1988.  While defendants neither admit liability nor a [*sic*] statutory violation under Section 1983, for the purposes of the fee application only, defendants agree that the court has jurisdiction to consider and rule on such fee application, that the fee application is properly before the court and that the court has the power to render an award.  Defendants will not argue or contend that Plaintiff is not the prevailing party, nor will they imply that the nature of the settlement or its terms prevents Plaintiff from recovering attorney's fees under the statute.  Any costs and fees so awarded shall be in addition to the compensation paid to Plaintiff pursuant to paragraph 1, above [specifying the damages payment].  The court retains jurisdiction to render an award of attorney's fees and costs.  Following adjudication by the court of awardable fees and costs, the court shall issue judgment thereon, limited only to the issue of costs and fees."

In the second week of November 2013 plaintiff filed his motion for $1,448,397 in attorney fees and $75,255 in costs, under both section 1988 and Code of Civil Procedure section 1021.5.  Plaintiff stated that the requested amount of fees was based on "2,419.9 compensable *attorney* hours spent on this matter for all meritorious work, utilizing reasonable hourly billing rates roughly 20% below established market rates[,] i.e[.,] ranging from $425 to $650 per hour."  Plaintiff also requested a 1.5 multiplier to the lodestar amount "to account for the significant risk counsel has taken in litigating this hotly[ ]contested matter on a wholly contingent basis, with little prospect of settlement until the eve of trial, bringing the total requested fee to $2,172,595."  With the enhancement and costs, the total amount plaintiff requested was $2,247,850.

Subsequently, $102,998.75 was added for "fees-on-fees work," for a final request of $2,350,848.

Timothy D. McMahon, one of the two principal attorneys representing plaintiff, submitted multiple declarations in support of the motion. McMahon related his professional experience and described the expertise of all attorneys who had participated in the case on plaintiff's behalf. He reviewed the detailed history of the current litigation, including the summary judgment motion, the appeal, and trial preparation efforts. He noted that plaintiff's counsel had received no compensation for their work on this six-year-old case, and that their involvement had caused his firm to decline potentially lucrative new opportunities. Having analyzed the prevailing "non-contingent market rate" for the San Francisco Bay Area, McMahon calculated $795 per hour as appropriate based on several assumptions, including his "experience, reputation and success in civil litigation and trial work." He was, however, requesting only $650 per hour as a reasonable billing rate. Likewise, he estimated the market rate at $550 per hour for two other attorneys who had assisted in the case, but requested only $420 per hour for each of those attorneys. Based on counsel's "reduced hourly rates" and 2419.9 hours of work on the case, McMahon calculated the breakdown of the fee request as follows: McMahon, 996.4 hours ($647,660); co-lead counsel Matthew D. Davis, 870 hours ($565,500); Jeffry W. Lochner, 113.2 hours ($48,110); and Samuel Miller, 440.3 hours ($187,127). McMahon urged the court to recognize the "substantial impact on the public" following the dismissal of plaintiff's criminal case.[2]

---

[2] McMahon noted for the court the shift in police department policy regarding the use of fabricated evidence after plaintiff's criminal case was dismissed, and he called attention to an investigation by the Santa Clara County District Attorney, which had been undertaken to reduce the risk of another case of false testimony by a police officer based on a "ruse" crime lab document. He further noted "extensive press coverage" of the misuse of the ruse document in the criminal prosecution of plaintiff, he noted the suspension of the prosecuting attorney in the case, and he noted the active interest taken (continued)

Co-lead counsel Davis also submitted a declaration with the motion. He related his own litigation experience and that of Miller, whom Davis had hired to assist him with the case. Davis stated that he and McMahon had omitted dozens of hours that would otherwise have been compensable, and he had reduced or eliminated charges for time spent on arguably duplicative or administrative work or for tasks that did not require his "level of experience or expertise." Miller himself provided a declaration attesting to the substantial amount of "no-charged" time spent on the case.

In their opposition defendants maintained that this was "an ordinary case," which did not necessitate the expenditure of the number of hours claimed by plaintiff's counsel. Defendants asked the court to reduce the claimed hours by at least half and to reduce significantly the billing rate of all counsel involved. They also disputed plaintiff's entitlement to fees under Code of Civil Procedure section 1021.5, because (1) the settlement agreement provided for fees under only the federal statute, (2) the case did not involve issues of state law, and (3) the factual foundation of fees under Code of Civil Procedure section 1021.5 had not been met—particularly the criterion that the lawsuit confer a significant benefit on the public.

Defendants did not, however, object to specific billing entries with the exception of 23.85 hours they considered examples of "outrageous overbilling." Their suggested cut in hours for each stage of the litigation culminated in a calculation of *all* the hours claimed by plaintiff's attorneys, less only those 23.85 hours. What they actually recommended to the court was a reduction in each attorney's *billing rate* and a 50-percent reduction of the *total* lodestar amount.

---

by one local public interest group and by civil rights attorneys throughout the country. Finally, McMahon submitted a declaration from a professor at University of Santa Clara School of Law attesting to the importance of *Kerkeles I* to the protection of suspects' due process rights in the context of fabricated evidence.

The matter was extensively briefed and orally argued before the Honorable William J. Elfving, who had not presided over any of the preceding litigation. Both sides offered declarations not only from counsel but also from other practicing attorneys. Plaintiff submitted a declaration from Richard M. Pearl, 90 percent of whose law practice was "devoted to issues involving court-awarded attorney's fees," and one from Michael J. Haddad, a civil rights trial lawyer for 22 years with experience litigating civil rights cases, including cases against the City. In his declaration Pearl extensively catalogued former public interest cases, listing the hourly rates accorded by the court based on the number of years of each attorney's experience. Pearl believed that the rates requested by plaintiff's attorneys (before their self-imposed discounts) were "well in line with the non-contingent market rates charged for reasonably similar services by San Francisco Bay Area attorneys of reasonably similar qualifications and experience." Pearl also emphasized the distinction between an hourly fee arrangement and contingent compensation, pointing out that an attorney takes a significant risk in taking a case on a contingent-fee basis. Because of the uncertainty of the outcome, he stated, such an attorney should be awarded higher fees to help "ensure that meritorious cases will be brought to enforce important public interest policies and that clients who have meritorious claims will be better able to obtain qualified counsel."

In his declaration Haddad agreed with Pearl that contingent-fee cases entail a significant risk of being paid late or not at all. Because of that risk of nonpayment or delayed payment, he added, contingent fee cases require counsel to "make sure time spent working on this case is **necessary**, since time spent on this case is time that counsel does not have to spend on other cases or on new client generation." Haddad stated that in his experience, the City "thoroughly and aggressively defended" civil rights cases brought against it. Haddad opined that McMahon and David should be paid at least $700 per hour for this case, based on the current billing rates for experienced Bay Area civil rights attorneys.

In rebuttal, defendants offered the declaration of Clifford Greenberg, the primary attorney for the City throughout this case, as well as one by Stuart Kirchick, a personal injury attorney who had handled 25 civil rights cases, and one by Anthony Boskovich, a solo practitioner specializing in civil rights cases. Greenberg recommended $400 per hour for lead counsel after identifying past cases in which attorneys had received $300-350 an hour, with one exceptional case in which a "very good attorney" received $525 an hour.

In his declaration in support of the City, Kirchick noted that he had received $350 an hour for a "complicated" zoning permit case against the City. He also stated that in the most complicated summary judgment case he had worked on, he spent 50 hours or less in preparing the opposition. Boskovich stated that he billed at the "low to middle" rate of $320 an hour, but in his fee applications he added a multiplier that would bring his fee to $450, which "is at the high end for a reasonable rate for a highly experienced civil rights litigator before multiplier." He speculated that if he had worked on *Kerkeles I*, he would have spent no more than 80 to 100 hours.[3]

On March 11, 2014, Judge Elfving ruled on plaintiff's motion. He agreed with defendants that the attorneys' claimed number of hours was excessive. He then followed the method of calculating the lodestar amount advocated by defendants, using the lower hourly rates recommended by defendants for plaintiff's four attorneys. McMahon and Davis were each to receive compensation at $400 per hour; the other two attorneys, Miller and Lochner, were to receive $250 and $150 an hour, respectively. Applying those figures to the *full* number of hours claimed by the attorneys involved in the case, the court calculated the "subtotal" as $873,615.00. The court then reduced this lodestar

---

[3] Boskovich cautioned, however, that he was "expressing no opinion as to the amount of time actually spent" by plaintiff's attorneys on *Kerkeles I*.

amount by 50 percent, yielding a total compensation of $436,807.50.  The court declined to apply the 1.5 multiplier pursuant to Code of Civil Procedure section 1021.5, because "the parties did not agree to evaluate the fee motion under state law.  Additionally, Plaintiff does not qualify for private attorney general status under the statute."  Finally, the court awarded costs of $23,935.07.[4]  This timely appeal followed.

*Discussion*

1. *Statutory Basis for Attorney Fees*

It is undisputed that the costs recoverable by a prevailing party under Code of Civil Procedure section 1032 include attorney fees when those fees are "authorized by" either "Contract," "Statute," or "Law." (Code of Civ. Proc. 1033.5, subd. (a)(10); *Santisas v. Goodin* (1998) 17 Cal.4th 599, 606.)  This provision represents an exception to the American Rule, codified in Code of Civil Procedure section 1021, which requires each party to a lawsuit to pay his or her own attorney fees. (See *Tract 19051 Homeowners Ass. v. Kemp* (2015) 60 Cal.4th 1135, 1142; *Musaelian v. Adams* (2009) 45 Cal.4th 512, 516.)  The federal courts also recognize departures from the American Rule for clearly stated statutory or contractual provisions.  (See, e.g., *Baker Botts L.L.P. v. ASARCO LLC* (2015) __ U.S. __, __ [135 S.Ct. 2158, 2164.)

In this case, of course, attorney fees were authorized by paragraph 2 of the parties' settlement agreement, which provided for plaintiff's recovery under the federal statute, section 1988.  A threshold issue, however, is whether plaintiff was *also* entitled to attorney fees under the state statute, Code of Civil Procedure section 1021.5.  That statute permits recovery by a successful plaintiff in specified circumstances, including when "a

---

[4] This total reflects the amount of plaintiff's claimed litigation expenses ($75,255.45), less $45,133.00 for expert witness fees.  Plaintiff does not contest the cost award on appeal.

significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons."

Contrary to defendants' suggestion, the scope of the attorney fees provision in the settlement agreement is a question of law, which we examine de novo, in accordance with "the same principles applicable to any other contractual agreement." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*); *Hemphill v. Wright Family*, *LLC* (2015) 234 Cal.App.4th 911, 914; *Khavarian Enterprises*, *Inc*. *v*. *Commline*, *Inc*. (2013) 216 Cal.App.4th 310, 318.) "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." (*Winet*, *supra*, at p. 1166.)

The parties' agreement specifically provided for attorney fees under section 1988. No mention was made of Code of Civil Procedure section 1021.5. Citing *Brayton Purcell LLP v*. *Recordon & Recordon* (N.D. Cal. 2007) 487 F.Supp.2d 1124, 1128 (*Brayton Purcell*), plaintiff asserts that the contract's silence regarding fees under the state statute does not mean that they were unavailable; indeed, they contend that there had to be an explicit waiver of the right to those fees in order to disallow them. *Brayton Purcell*, however, is inapposite. There the court rejected the assertion of waiver by silence because the contested fees were those to which the prevailing party was entitled by the federal Copyright Act (17 U.S.C. § 505), notwithstanding the absence of a provision in the parties' arbitration agreement for fees in post-arbitration proceedings.

The agreement in this case was not silent on the matter of attorney fees. On the contrary, it *expressly permitted* plaintiff's counsel to seek such fees under the federal statute, section 1988. In addition, paragraph No. 7 contained an integration clause stating that the settlement agreement "represents the entire agreement and understanding between the Parties regarding settlement of the Action," and the parties declared that "the terms of this Settlement Agreement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise and settlement of the Action and the underlying dispute . . . ." We may not add terms

reflecting an understanding that is not evident in the plain language of the parties' contract. (See *Apra v. Aureguy* (1961) 55 Cal.2d 827, 831 [in construing a contract that appears to be a complete expression of the entire agreement, courts will not add term on which agreement is silent]; see also *Vaillette v. Fireman's Fund Ins. Co.*, (1993) 18 Cal.App.4th 680, 686 ["parties' expressed objective intent, not their unexpressed subjective intent, governs"].)

We thus conclude that the attorney fees plaintiff was entitled to recover were those stated in the settlement agreement—that is, those available to him under section 1988. This statute was enacted by Congress as part of The Civil Rights Attorney's Fees Awards Act of 1976 "to ensure 'effective access to the judicial process' for persons with civil rights grievances. (H. R. Rep. No. 94-1558, p. 1 (1976).)" (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 429 (*Hensley*).) Subdivision (b) specifically permits an award of reasonable attorney fees to a person who has been deprived of his or her civil rights in violation of section 1983, as plaintiff alleged in *Kerkeles I*. It provides, in pertinent part, "In any action or proceeding to enforce a provision of . . . [§ 1983] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." See *Lefemine v. Wideman* (2012) 133 S.Ct. 9, 11 [absent special circumstances, protester who obtained injunction against police was entitled to attorney fees as prevailing party].)

The entitlement to section 1988 fees is part of the remedy for section 1983 violations "whether the action is brought in federal or state court." ((*Maine v. Thiboutot* (1980) 448 U.S. 1, 11.) Because the entitlement arises under federal law, "we follow the federal standard for determining section 1988 issues." (*Board of Administration v. Wilson* (1997) 57 Cal.App.4th 967, 974.)

2. *Propriety of the Section 1988 Fee Award*

As section 1988 itself states, the amount and scope of the fee award is generally a matter for the court's discretion. (§ 1988; see also *Perdue v. Kenny A.* (2010) 559 U.S.

542, 558 (*Perdue*); *Hensley*, *supra*, 461 U.S. at p. 437; *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1308.) "The amount of the fee, of course, must be determined on the facts of each case," including the level of success attained by the plaintiff. (*Hensley*, *supra*, at pp. 429, 430; *Farrar v. Hobby* (1992) 506 U.S. 103, 114.)

Absent some clear ground for an exception, fees in section 1983 cases should be determined under the "lodestar" method, which requires the court to (1) determine the number of hours reasonably expended in obtaining the result, (2) determine a reasonable hourly rate, (3) multiply the first figure by the second figure, and (4) adjust the result to reflect other pertinent factors. (*Morales v. City of San Rafael* (9th Cir. 1996) 96 F.3d 359, 363 (*Morales*); *Gregory v. County of Sacramento* (9th Cir. 2006) 168 Fed.Appx. 189, 191.) The lodestar method is to be used for attorney fees even when the section 1983 case was taken on a contingency basis. (*Pickett v. Sheridan Health Care Center* (7th Cir. 2011) 664 F.3d 632 (*Pickett*).)

"In making the award, the district court must strike a balance between granting sufficient fees to attract qualified counsel to civil rights cases [citation] and avoiding a windfall to counsel. [Citation.] The way to do so is to compensate counsel at the prevailing rate in the community for similar work; no more, no less." (*Moreno v. City of Sacramento* (9th Cir. 2008) 534 F.3d 1106, 1111 (*Moreno*); see also *Blanchard v. Bergeron* (1989) 489 U.S. 87, 93 [Section 1988 contemplates "reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less"].) "Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights. But unjustified enhancements that serve only to enrich attorneys are not consistent with the statute's aim. In many cases, attorney's fees awarded under § 1988 are not paid by the individuals responsible for the constitutional or statutory violations on which the judgment is based. Instead, the fees are paid in effect by state and local taxpayers, and because state and local governments have limited budgets, money that is used to pay

attorney's fees is money that cannot be used for programs that provide vital public services." (*Perdue*, *supra*, 559 U.S. at p. 559, fn. omitted.)

The United States Supreme Court has emphasized that the lodestar figure "is more than a mere 'rough guess' or initial approximation of the final award to be made. Instead, we found that '[w]hen . . . the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product *is presumed* to be the reasonable fee' to which counsel is entitled." (*Pennsylvania v. Del. Valley Citizens' Council* (1986) 478 U.S. 546, 564 (*Delaware Valley I*), quoting *Blum v. Stenson* (1984) 465 U.S. 886, 897 (*Blum*).) "[T]here is a 'strong presumption' that the lodestar figure is reasonable." (*Perdue*, *supra*, 559 U.S. at p. 554. The presumption may be overcome "only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts. [Citation.]" (*Delaware Valley I*, *supra*, at p. 565; see also *Bywaters v. United States* (2012) 670 F.3d 1221, 1229 [downward adjustment for amount involved and results obtained improper after lodestar calculation].)

In making such an adjustment, the court must "employ a methodology that permit[s] meaningful appellate review" rather than fashioning the award "on an impressionistic basis." (*Perdue*, *supra*, 559 U.S. at p. 558.) A downward adjustment to the lodestar may reflect inadequate documentation of the hours worked (apparently not at issue here) or "hours that were not 'reasonably expended.' [Citation.] Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." (*Hensley*, *supra*, 461 U.S. at p. 434.) Also subject to reduction is an amount expended for unsuccessful claims. (*Id*. at pp. 434-435.)

In this case, the court properly recognized that a fee award must begin with the lodestar amount. The order purported to compute that amount by first pointing to the excessive number of hours claimed by plaintiff's attorneys: "The court has reviewed the time billed and made an assessment as to whether it is reasonable in light of the work performed and the context of the case. It is appropriate to exclude excessive, redundant and unnecessary hours when calculating a lodestar. The court has concluded that Plaintiff's attorneys expended far more time than a reasonable attorney could ever bill a paying client for. An across the board 50% reduction in the claimed hours billed is warranted."

It is noteworthy that the court did *not* then reduce the number of hours claimed by plaintiff's attorneys. Instead, the court multiplied the exact number of hours counsel had claimed by the hourly rates the court believed were "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." The product of that calculation, $873,615, was the lodestar amount. The court, however, divided that amount by half and called the *remaining* total, $436,807.50, the lodestar. Plaintiff, however, does not complain of internal inconsistency in the court's application of its view of plaintiff's fee claim, and it does not affect our disposition of plaintiff's appeal.

3. *The Court's Explanation of the Fee Award*

Plaintiff contends that the court's explanation of its order was inadequate and reflected an arbitrary application of the law governing attorney fee orders. We agree. Although section 1988 clearly affords the court discretion to determine a reasonable fee, that discretion "is not unlimited. It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement. Unless such an explanation is given, adequate appellate review is not feasible, and without such review, widely disparate awards may be made, and awards may be influenced (or at least, may appear to be influenced) by a judge's subjective

opinion regarding particular attorneys or the importance of the case. In addition, in future cases, defendants contemplating the possibility of settlement will have no way to estimate the likelihood of having to pay a potentially huge enhancement." (*Perdue*, *supra*, 559 U.S. at pp. 558-559; see also *Hensley*, *supra*, 461 U.S. at p. 437 ["It remains important . . . for the district court to provide a concise but clear explanation of its reasons for the fee award"]; *Gray ex rel. Alexander v. Bostic* (11th Cir. 2010) 613 F.3d 1035, 1039.) The explanation "need not be lengthy"—but it must not be " 'a mere conclusory statement.' " (*Pickett*, *supra*, 664 F.3d at p. 651.)

When a "voluminous fee application" is made, the court may, as it did here, "make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure." (*Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1399 (*Gates*).) These percentage cuts to large fee requests are, however, "subject to heightened scrutiny and the use of percentages, in any case, neither discharges the district court from its responsibility to set forth a 'concise but clear' explanation of its reasons for choosing a given percentage reduction nor from its duty to independently review the applicant's fee request." (*Id.* at p. 1400.) If the record reveals no indication of the court's reasoning, the reviewing court may understandably conclude that the lower court, instead of independently reviewing counsel's records, merely "threw up its hands" and simply relied on the opposing party's suggested percentage cut. (*Id.* at p. 1401; *Ferland v. Conrad Credit Corp.* (9th Cir. 2001) 244 F.3d 1145, 1150.)

Indeed, federal courts have not been sympathetic to these across-the-board reductions, even when there is duplication of effort. In some protracted cases, new statutes, regulations, or case law may have required additional, even duplicative research. In *Moreno*, *supra*, 534 F.3d at pp. 1112-1113, the Ninth Circuit Court of Appeals disapproved the district court's multiple cuts of attorney hours in a section 1983 case based on the insufficiency of the court's explanation. A cut of 25 percent for duplicative work, for example, was unacceptable without a specific explanation, especially given the

attorney's own reduction of her fees by 9 percent. Merely calling the hours "excessive" was insufficient without saying why. Likewise, a "dramatic" 50-percent cut in hours for interviews and investigations was not supported by the court's "cursory explanation" that the amount of time spent was "unreasonable." (*Moreno*, *supra*, at pp. 1113-1114.) "Where the difference between the lawyer's request and the court's award is relatively small, a somewhat cursory explanation will suffice. But where the disparity is larger, a more specific articulation of the court's reasoning is expected." (*Id*. at p. 1111.) Even a court that is familiar with the litigation, having presided over the proceedings—unlike the court in the present case—"cannot tell by a cursory examination which hours are unnecessarily duplicative." (*Id*. at p. 1112; *Chaudhry v. City of Los Angeles* (9th Cir. 2014) 751 F.3d 1096, 1112 (*Chaudhry*).)

The *Moreno* court did state that a lower court may impose "a small reduction, no greater than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation. Here, however, the district court cut the number of hours by 25 percent, and gave no specific explanation as to which fees it thought were duplicative, or why. While we don't require the explanation to be elaborate, it must be clear, and this one isn't." (*Moreno*, *supra*, 534 F.3d at p. 1112; see also *Gonzalez v. City of Maywood* (9th Cir. 2013) 729 F.3d 1196, 1203 (*Gonzalez*) [court's failure to explain cuts in billing entries suggests arbitrary selection of percentage reductions].) Thus, when imposing a reduction greater than 10 percent, the court "must explain why it chose to cut the number of hours or the lodestar by the specific percentage it did." (*Gonzalez*, *supra*, at p. 1203.)

The court's explanation in this case was even less specific, and the cut far greater, than most of those discussed in *Moreno*. Here the ostensible basis for reducing plaintiff's claimed hours is solely that his attorneys "expended far more time than a reasonable attorney could ever bill a paying client for." The source as well as the result of this vague, cursory statement is a wholesale adoption of the defense opposition, which itself only generally protested for each phase of the litigation that the hours expended were

unjustifiably excessive.[5]  The court did not explain why those hours needed to be reduced by 50 percent rather than some other percentage.[6]  In fact, when the full fee request ($2,350,848.75) is compared with the fee award ($436,807.50), the cut applied here amounts to more than 80 percent.  And as in *Moreno*, this was in addition to the hundreds of billing entries for which plaintiff was never charged and the reduced rates that lead counsel had already applied to the work of all four attorneys.

Given that the court was also reducing the hourly rate, we cannot simply presume that there are valid, specific reasons for the severe across-the-board reduction in the hours attributed to counsel's effort in this case.  "We can't defer to reasoning that we can't review; if all the district court offers is a conclusory statement that a fee request is too high, then we can't tell if the court is applying its superior knowledge to trim an excessive request or if it is randomly lopping off chunks of the winning lawyer's reasonably billed fees." (*Moreno*, *supra*, 534 F.3d at p. 1116; see also *Gates*, *supra*, 987 F.2d at p. 1400-1401 [district court's failure to articulate concise but clear explanation for 10 percent across-the-board reduction made reviewing court unable to assess whether the district court abused its discretion].)  "It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees.  The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where [the] plaintiff's lawyer engages in

---

[5] As noted earlier the only specifically challenged hours, cited as examples of overbilling, were 23.85 hours for various tasks defendants believed were unnecessarily undertaken or prolonged.

[6] In addition, the reference to paying clients is unclear.  If the court meant that plaintiff's attorneys padded their hours, it should have identified those hours.  If it meant that plaintiff's attorneys would have done the same work in half the time for a paying client, it should have said so and explained how that would have been accomplished.  If it meant that a paying client would not have accepted this degree of effort on the case, that should have been explained as well.

churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." (*Moreno*, *supra*, at p. 1112.)

We thus conclude that the reasoning expressed in the court's order does not meet the federal criterion of a clear and specific explanation sufficient for meaningful appellate review. Indeed, it is not at all evident that the court independently reviewed the parties' submissions before signing the order drafted by defense counsel. (See *Gates*, *supra*, 987 F.2d at p. 1400 [abuse of discretion where court apparently accepted uncritically party's suggested reductions and failed to review the record independently, "even in a limited manner, in order to substantiate the accuracy of those reductions"].) The Ninth Circuit's admonition in *Moreno* is apposite here: "We are well aware that awarding attorneys' fees to prevailing parties in civil rights cases is a tedious business. And it may be difficult for the district court to identify the precise spot where a fee request is excessive. But the burden of producing a sufficiently cogent explanation can mostly be placed on the shoulders of the losing parties, who [have not only] the incentive, but also the knowledge of the case to point out such things as excessive or duplicative billing practices. If opposing counsel cannot come up with specific reasons for reducing the fee request that the district court finds persuasive, it should normally grant the award in full, or with no more than a haircut." (*Moreno*, *supra*, 554 F.3d at p. 1116.) Especially where, as here, the case has concerned the vindication of an individual's civil rights, we cannot endorse the superior court's draconian, blanket reduction in complete and uncritical conformance to the defendants' proposals.

4. *Reduction of Billing Rates*

In applying for attorney fees after a section 1983 victory, the fee applicant has the burden "to produce satisfactory evidence—in addition to the attorney's own affidavits— that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." (*Blum*,

*supra*, 465 U.S. at p. 895, fn. 11; *Carey v. City of Wilkes-Barre* (3d Cir. 2012) 496 Fed.Appx. 234, 236 (*Carey*); *Chaudhry*, *supra*, 751 F.3d at pp. 1110-1111 [affidavits of the applicant attorney and other attorneys are satisfactory evidence of the prevailing market rate].)  If a fee applicant presents such evidence, the opposing party " 'has a burden of rebuttal that requires submission of evidence  . . . challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits.' [Citation.]" (*Chaudhry*, *supra*, at pp. 1110-1111; *Carey*, *supra*, at p. 237.)

Plaintiff met his initial burden by producing declarations not only from the two lead attorneys, McMahon and Davis, but also from Pearl and Haddad.  Defendants' rebuttal contained declarations from Greenberg, Kirchick, and Boskovich.  But the court's ruling does not evince the burden-shifting analysis based on an evaluation of the evidence supplied by the parties.  The court stated only that it had "endeavored to select rates that are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Although we generally defer to the superior court's discretionary selection of the appropriate hourly rate, we have already determined that the insufficiency of the court's explanation compels a remand in any event.[7]  The court may then revisit the evidence provided and thus reach a "reasoned conclusion" as to the prevailing hourly rate for comparable services in the applicable marketplace.  (*Loughner v. University of Pittsburgh* (3d Cir. 2001) 260 F.3d 173, 180; see *Carey*, *supra*, 496 Fed.Appx. at pp. 237-238 [failure to follow appropriate procedures in determining hourly rate was error, but harmless].)  "The court may rely on its own knowledge and familiarity with the legal market in setting a

---

[7] In his briefs and by separate motion on appeal, plaintiff urges this court to make the necessary findings as to the appropriate compensation to which his attorneys are entitled, pursuant to Code of Civil Procedure section 909 and California Rules of Court, rule 8.252.  We decline that request.

reasonable hourly rate." (Cf. *Heritage Pacific Financial*, *LLC v*. *Monroy* (2013) 215 Cal.App.4th 972, 1009.) Among the factors the court may consider are the "special skill and experience" of the participating attorneys and the quality of counsel's representation. (*Blum*, *supra*, 465 U.S. at pp. 898, 899; *Delaware Valley I*, *supra*, 478 U.S. at pp. 565-566; *Perdue*, *supra*, 559 U.S. at p. 553.)

In its explanation of the eventual award the court should also indicate the extent to which it has considered the fact that counsel represented plaintiff on a contingent-fee basis. (*In re Abrams & Abrams*, *P.A.* (4th Cir. 2010) 605 F.3d 238, 245; *Charlebois v*. *Angels Baseball LP* (C.D. Cal. 2012) 993 F.Supp.2d 1109, 1123.) Because that risk factor generally is subsumed in the lodestar calculation, in most circumstances it may not be used to enhance the product of hours and hourly rate, as that could amount to double counting and "a windfall [to the] attorney who prevailed in a difficult case." (*Pennsylvania v*. *Del*. *Valley Citizens' Council* (1987) 483 U.S. 711, 726-727; *City of Burlington v*. *Dague* (1992) 505 U.S. 557, 562-563; *Perdue*, *supra*, 559 U.S. at p. 554; compare *Ketchum v*. *Moses* (2001) 24 Cal.4th 1122, 1137 [fee enhancement for contingent risk permissible under Code of Civ. Proc. § 425.16].)[8] Likewise, the novelty and complexity of the issues presumably will be fully reflected in the number of billable hours credited to counsel—or, if counsel's "special skill and experience" was required, in the hourly rate. (*Blum*, *supra*, 465 U.S. at p. 898.) Whether " 'rare' " and " 'exceptional' " circumstances exist to enhance the lodestar amount is a question within the province of the superior court to decide upon remand. (*Perdue*, *supra*, at p. 554.)

---

[8] In arguing for an enhancement below, counsel conceded that contingent risk may be a factor in applying a multiplier to the lodestar only under California law, whereas courts do not recognize enhancement on this basis under federal law.

*Disposition*

The order is reversed, and the matter is remanded to enable the superior court to reconsider plaintiff's motion for attorney fees under section 1988 and to provide a clear, specific explanation of the resulting award, including the reasons for its calculation of the lodestar amount and for any adjustment of the lodestar amount.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

WALSH, J.*

*Kerkeles v. City of San Jose et al.*
H040949

_____

*Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-08-CV103523 |
|---|---|
| Trial Judge: | Honorable William J. Elfving |
| Counsel for Plaintiff/Appellant:<br>Michael Kerkeles | Timothy D. McMahon<br>Jeffry W. Lochner<br>Corsiglia, McMahon & Allard<br><br>Matthew David Davis<br>Walkup, Melodia, Kelly, & Schoenberger |
| Counsel for Defendant/Respondent:<br>City of San Jose et al. | Clifford S. Greenberg<br>Deputy City Attorney |

*Kerkeles v. City of San Jose et al.*
H040949